UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELLE BERTRAND,<br><br>        *Plaintiff,*<br><br>      v.<br><br>JOHNSON & JOHNSON and ETHICON, INC.,<br><br>        *Defendants.* | Civil Action No.<br><br><br>**COMPLAINT AND<br>DEMAND FOR TRIAL<br>BY JURY** |

Plaintiff MICHELLE BERTRAND, by her attorneys, Sullivan Papain Block McGrath & Cannavo P.C., complaining of the Defendants herein, alleges upon information and belief as follows:

## I.    INTRODUCTION

1.    As detailed below, Plaintiff MICHELLE BERTRAND ("Plaintiff") brings this action for damages for severe personal injuries, including and not limited to exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystocele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, dyspareunia, and the need for additional surgery, all of which she sustained as a consequence of being implanted with the Gynecare TVT System / Prolift+M device, which was designed, manufactured, marketed, and distributed by the Defendants JOHNSON & JOHNSON and ETHICON, INC.

## II.    THE PARTIES

2.    Plaintiff resides in Westchester County, State of New York.

3.    Plaintiff was implanted with the *Gynecare TVT System / Prolift+M device by Ethicon* ("subject Product") in accordance with instructions, directions and information made

available to her physicians and surgeons by Defendants JOHNSON & JOHNSON and ETHICON, INC., both of which are the designers and manufacturers of the subject product.

4.      As a result of being implanted with the subject Product, Plaintiff developed severe personal injuries, including and not limited to exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystocele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, dyspareunia, and loss of earnings.  Plaintiff was required to undergo surgery to remove the subject Product and will likely need additional related surgery in the future.

### III.      JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000.00.

6.      This Court has supplemental jurisdiction over the common law and state claims pursuant to 28 U.S.C. § 1367.

7.      Plaintiff resides in the Southern District of New York.

8.      Upon information and belief, Defendant JOHNSON & JOHNSON ("JOHNSON & JOHNSON") is a New Jersey corporation, and, according to its website, one of the largest medical device companies in the world.  Its world headquarters are located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

9.      Upon information and belief, at all relevant times, JOHNSON & JOHNSON has transacted and conducted business in the State of New York, including designing, manufacturing, promoting, marketing, researching, distributing, introducing, and selling medical devices and prescription medication within New York, and contracting to supply the subject

Product and other pelvic mesh products in the state and supplied such products to New York residents and their prescribing doctors.

10.    Upon information and belief, JOHNSON & JOHNSON expected or should have expected that its acts would have consequences within the Southern District of New York and derived substantial revenue from interstate commerce.

11.    Upon information and belief, JOHNSON & JOHNSON is and at all relevant times was in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute products known as Gynecare TVT; TVT-Obturator; TVT-SECUR; TVT-Exact; TVT-Abbrevo; Gynecare Prolift Total, Anterior, and Posterior Pelvic Floor Repair Systems; Prolift+M; Gynemesh/Gynemesh PS; and Prosima.  These products are designed and sold inclusive of the instruments, instructions and procedures for implantation.

12.    Upon information and belief, Defendant ETHICON, INC. ("ETHICON") is a wholly owned subsidiary of JOHNSON & JOHNSON.  ETHICON is located in Somerville, New Jersey.

13.    Upon information and belief, at all relevant times ETHICON has transacted and conducted business in the State of New York, including designing, manufacturing, promoting, marketing, researching, distributing, introducing, and selling medical devices and prescription medications within New York, and contracting to supply the subject Product and other pelvic mesh products in the state and supplied such products to New York residents and their prescribing doctors.

14.    Upon information and belief, at all relevant times ETHICON expected or should have expected that its acts would have consequences within the Southern District of New York and derived substantial revenue from interstate commerce.

3

15.     Upon information and belief, ETHICON is and at all relevant times was in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute pelvic mesh products designed and sold to treat conditions related to the pelvic health of women.

16.     Upon information and belief, Gynecare is a product brand name of ETHICON and JOHNSON & JOHNSON.  ETHICON's website features the following subtitle under the ETHICON corporate logo: "part of the Johnson & Johnson family of companies." A range of Gynecare products are advertised on the same ETHICON website, including the subject Product. For example, detailed information regarding the Gynecare TVT™ Obturator System may be found at http://www.ethicon.com/healthcare-professionals/products/uterine-pelvic/incontinence-slings/gynecare-tvt-obturator-system-tension-free-support-incontinence (last visited September 21, 2017). Ethicon Women's Health & Urology is and/or was a division of ETHICON. The Gynecare Prolift was advertised and/or marketed as a product of Ethicon Women's Health & Urology.

17.     Defendants JOHNSON & JOHNSON and ETHICON (hereinafter jointly referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed pelvic mesh products designed and sold to treat conditions related to the pelvic health of women, through the brand names Gynecare and Ethicon Women's Health & Urology.

18.     Defendants are subject to *in personam* jurisdiction in the United States District Court for the Southern District of New York because they placed defective products in the stream of commerce and those products caused personal injuries to Plaintiff at her residence in the State of New York.

4

19.     Cases involving claims against these Defendants have been consolidated as *In re Ethicon Pelvic Repair Litigation*, Multidistrict Litigation Docket Number 2327, in the United States District Court for the Southern District of West Virginia, pursuant to 28 U.S.C. § 1407.

## IV.     FACTUAL BACKGROUND

20.     In or about October 2002, Defendants began to market and sell a product known as Gynemesh for the treatment of female pelvic medical conditions, primarily pelvic organ prolapse and stress urinary incontinence.

21.     Defendants derived Gynemesh from earlier products of theirs known as Prolene Mesh and Prolene Soft Mesh.    Prolene Mesh and Prolene Soft Mesh were derived from Defendants' prolene mesh hernia products.

22.      In or about September 2005, Defendants began to market and sell products known as Prolift, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.  Prolift has been offered as an anterior, posterior, and total repair system.  All references to the Prolift include all variations thereof.

23.     In or about May 2008, Defendants began to market and sell a product known as Prolift+M, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prolift+M was and is offered as an anterior, posterior, and total repair system.  All references to the Prolift+M include all variations thereof.

24.     Defendants market and sell a product known as TVT, for the treatment of stress urinary incontinence and pelvic organ prolapse in females.  The TVT has been and is offered in multiple variations including, but not limited to, the TVT, Prolift TVT-O, and TVT-S.   All references to the TVT include all variations thereof.

25.    The products known as TVT-O, Prolene Mesh, Gynemesh, Prolift, Prolift+M, and TVT, and all other pelvic mesh products designed and sold by Defendants for female pelvic organ prolapse and stress urinary incontinence, inclusive of the instruments, instructions, and procedures for implantation, are collectively referred to herein as "Defendants' Pelvic Mesh Products."

26.    Defendants sought and obtained United States Food and Drug Act ("FDA") clearance to market the Defendants' Pelvic Mesh Products including the subject Product under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act at 21 C.F.R. 807.92(a)(3) ("Section 510(k)"). Section 510(k) allows for marketing of a medical device without safety and efficacy studies if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976.

27.    Defendants knowingly and deliberately made material misrepresentations to the FDA concerning the design, manufacture, safety, and efficacy of Defendants' Pelvic Mesh Products by representing that the products were Section 510(k) medical devices. Defendants' claims to the FDA, that Defendants' Pelvic Mesh Products were substantially equivalent to predicate devices marketed prior to May 28, 1976, misled the FDA and the consuming public.

28.    By marketing Defendants' Pelvic Mesh Products as Section 510(k) medical devices, Defendants were able to avoid conducting any formal review or undertaking any study of the products' safety or efficacy.

29.    Defendants' Pelvic Mesh Products were designed, patented, manufactured, labeled, marketed, and sold and distributed by Defendants, at all times relevant herein to the medical community and to patients as: safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical

6

conditions, primarily pelvic organ prolapse and stress urinary incontinence; and as safer and more effective as compared to the traditional products and procedures for treatment and other competing pelvic mesh products that have been in existence for the treatment of pelvic organ prolapse, stress urinary incontinence, and other related female pelvic conditions.

30.     Defendants have marketed and sold Defendants' Pelvic Mesh Products to the medical community at large and patients through sophisticated marketing campaigns and strategies.   Defendants' campaigns and strategies include, but are not limited to: direct to consumer advertising; aggressive marketing to health care providers at medical conferences, hospitals, private offices; payment of valuable consideration and benefits to health care providers;  documents; brochures; websites; and the provision of telephone information hotlines.

31.     Defendants went further by making public statements, in the form of written product descriptions, product labels, promotional and other materials, to the effect that implantation with Defendants' Pelvic Mesh Products was safe and effective and would not cause harm to patients.

32.     Notwithstanding their statements to the FDA and marketing campaigns to the medical community and patients, Defendants concealed facts that showed that Defendants' Pelvic Mesh Products were not safe and efficacious, but were dangerous and ineffective for the treatment of pelvic organ prolapse and stress urinary incontinence.

33.     Defendants knew that Defendants' Pelvic Mesh Products were not safe but dangerous.  The products actually caused serious injury and complications at a higher rate than disclosed.  Defendants suppressed adverse reports, and chose to not accurately and completely disseminate such critical information to the FDA, health care providers, and patients.

34.    Defendants also knew that Defendants' Pelvic Mesh Products were not efficacious but rather were ineffective at treating pelvic organ prolapse and stress urinary incontinence.    The products fail to perform as intended and require frequent and often debilitating corrective surgeries.  The number and frequency of required corrective surgeries also called into question the claimed efficacy of the products.

35.    That Defendants' Pelvic Mesh Products in fact have defects that create a high risk of unreasonable and dangerous injuries and side effects, often with severe permanent adverse health consequences, is well documented.  Defects include and are not limited to:

  a.    Defendants' Pelvic Mesh Products employ mesh material that reacts with human tissues and other naturally occurring human bodily material;

  b.    Defendants' Pelvic Mesh Products' mesh material is conducive to harboring infections;

  c.    Defendants' Pelvic Mesh Products migrate from the site of implantation;

  d.    Defendants' Pelvic Mesh Products' mesh materials abrade tissues;

  e.    Defendants' Pelvic Mesh Products frequently must be explanted or partially removed;

  f.    Explantation and partial removal of Defendants' Pelvic Mesh Products are themselves complex and risky surgeries;

  g.    To explant and partially remove Defendants' Pelvic Mesh Products, repeated surgeries and treatments are often required;

  h.    Defendants' Pelvic Mesh Products become embedded in human tissue;

  i.    Explant and removal of Defendants' Pelvic Mesh Products causes damage to organs and tissues;

  j.    Defendants' Pelvic Mesh Products are defective in shape, composition, weight, physical, chemical and mechanical

properties, and are inadequately engineered and are inherently inappropriate for use in the female pelvis;

k.     Defendants' Pelvic Mesh Products create an unreasonable risk of injury, including, and not limited to: vaginal erosion, mesh erosion, mesh contraction; infection; mesh extrusion; perforation; chronic pain; abscess formation; fistula; inflammation; scar tissue; dyspareunia; blood loss, neuropathic and other acute and chronic nerve damage; pudendal nerve damage; pelvic floor damage; pelvic pain; urinary and fecal incontinence; exacerbated and new prolapse of pelvic organs; and

l.     The corrective surgeries to locate and remove Defendants' Pelvic Mesh Products entail additional risks and dangers: pelvic organs, tissue, and nerve damage must be repaired; mesh must be located; painkiller, anesthesia, and antibiotics must be delivered to the pelvis, spine, and vagina; removal of portions of genitalia is sometimes necessary; repeated corrective surgeries are often necessary.

From here on, the above described defects are collectively referred to herein as "Defects."

36.     A study published in August 2010 in the *Journal of the American College of Obstetricians and Gynecologists* confirmed the existence of a high failure rate in Defendants' Pelvic Mesh Products.  The article noted that there is a high (15.6%) vaginal mesh erosion rate with the Prolift products, "with no difference in overall objective and subjective cure rates. This study questions the value of additive synthetic polypropylene mesh for vaginal prolapse repairs."

37.     Other studies in medical journals reached similar conclusions.

38.     Defendants failed to exercise reasonable care in determining the risks and potential adverse consequences of implanting Defendants' Pelvic Mesh Products in patients. Defendants did not conduct their own safety and efficacy studies.  Defendants failed to perform proper, adequate, and necessary testing of and research on Defendants' Pelvic Mesh Products. Defendants have failed to determine and evaluate the true risks and benefits presented by Defendants' Pelvic Mesh Products.

39.    Defendants' goals in making misrepresentations about the safety and efficacy of Defendants' Pelvic Mesh Products were to promote sales and ensure a high profit margin.

40.    Defendants intended that misleading marketing statements would induce reliance by medical professionals and members of the public, and that medical professionals and members of the public would purchase Defendants' Pelvic Mesh Products, under the belief that the products are safe and effective.

41.    Defendants knew that misleading marketing statements were inaccurate when made.  Alternatively, Defendants should have known that the statements were inaccurate when made.

42.    On July 13, 2011, the FDA issued a Safety Communication and thereby confirmed that "serious complications associated with surgical mesh for transvaginal repair of POP [pelvic organ prolapse] are not rare."

43.    Defendants have never provided adequate warnings or information on the risks posed by Defendants' Pelvic Mesh Products to the implanting physicians nor to women implanted with the products.  The information Defendants communicated to Plaintiff's physicians about the safety and efficacy of the subject Product did not constitute adequate notice.

44.    Physicians including Plaintiff's physicians read the information contained in Defendants' promotional materials, instructions, marketing materials and packaging for the Defendants' Pelvic Mesh Products, believed the information therein to be accurate, and relied upon the substance of the information in assessing the risks and benefits of the Defendants' Pelvic Mesh Products and advising patients including Plaintiff of the decision to implant the products.

45.    Patients, including Plaintiff, who have pelvic organ prolapse and stress urinary incontinence, have had several alternative treatment plans and products available to them that were safer and more efficacious than Defendants' Pelvic Mesh Products.

46.    Conservative and suitable alternatives have existed for treatment of stress urinary incontinence, pelvic organ prolapse and other similar female pelvic conditions.  Alternatives have existed for the materials used in products to treat stress urinary incontinence, pelvic organ prolapse and other similar female pelvic conditions.

47.    Defendants have failed to offer any real justification for physicians and patients to choose Defendants' Pelvic Mesh Products over existing conservative, safer, and more suitable alternatives.

48.    Plaintiff was not adequately advised by Defendants of safer alternative treatment plans and products.

49.    As a result of Defendants' actions, Plaintiff and her prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to Defects and ensuing high risks and dangers as described above.

50.    Defendants have provided incomplete, insufficient, and misleading trainings, materials, and information to treating physicians and implanting surgeons.

51.    Defendants' Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to the Defendants.

52.    Defendants' Pelvic Mesh Products, including Gynecare TVT System and Prolift+M that was implanted into women, like the Plaintiff, were in the same or substantially

similar condition as they were when they left the possession of Defendants, and in the condition directed by and expected by Defendants.

53.    Defendants also failed to design and establish a safe, effective procedure for explantation and removal of the Defendants' Pelvic Mesh Products. Due to this failure, when injuries or complications have arisen due to the Defects, medical providers were not advised of or trained in safe and effective methods of explanting and removing Defendants' Pelvic Mesh Products. Thus, further injuries have been incurred by patients.

54.    Plaintiff is one of the women who was implanted with the subject Product, namely the Gynecare TVT System / Prolift+M device, particular types of Defendants' Pelvic Mesh Products, and who suffered severe damage and complications thereafter.

55.    As a result of Defendants' acts, the subject Product was recommended to and subsequently implanted in Plaintiff to treat her for stress urinary incontinence and pelvic organ prolapse, both of which are conditions for which Defendants designed, marketed and sold the subject Product.

56.    In or around November 2009, Plaintiff was diagnosed with cystocele, rectocele, and stress incontinence.

57.    On December 4, 2009, surgeon Nicole Fleischmann, M.D. implanted Plaintiff with the Gynecare TVT System / Prolift+M device. The surgery was performed at White Plains Hospital Center, White Plains, New York.

58.    Following the surgery, Plaintiff began experiencing stress incontinence, difficulty urinating that increased over time, persistent lower abdominal and/or pelvic pain that increased over time, urinary tract infections, vaginitis, candidiasis, hematuria, and dyspareunia.

59.　　On May 18, 2017, Dr. Garely undertook corrective surgery to excise Plaintiff's Gynecare TVT System / Prolift+M device.　Both the pre- and post-operative diagnoses were "Vaginal/Pelvic pain, with history of vaginal mesh and urethral sling placed 8 years ago."　Dr. Garely found scarring under Plaintiff's vaginal mucosa.

60.　　A May 23, 2017 pathology report found erosion and inflammation in the squamous mucosa of the vaginal epithelium excised during Plaintiff's corrective surgery.

61.　　The corrective surgery relieved Plaintiff's lower abdominal and/or pelvic pain.

62.　　As a direct result of being implanted with the subject Product, over a number of years, Plaintiff suffered serious physical injury, including and not limited to exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and lost earnings.

63.　　Plaintiff's physicians would not have implanted the subject Product in Plaintiff had Defendants properly disclosed the Defects and the full range of risks and dangers associated with the subject Product.

64.　　Before and during the time Plaintiff was implanted with the subject Product, Defendants had the duty to provide the medical community, including Plaintiff's treating physicians, with adequate warnings and accurate information regarding the risks posed by the subject Product.　Defendants had the means to communicate through all media including and not limited to changing the instructions, warnings, and labels, providing continuing education seminars and symposia for treating physicians, providing posters, making calls to doctors, purchasing advertisements, and mailing promotional materials.

65.     By June 2012, the subject Product had become the subject of thousands of product liability lawsuits filed by women who were implanted with the defective devices.  Defendants also faced mounting pressure from the FDA and intense media scrutiny, spearheaded by consumer interest and public health groups.

66.     In June 2012, Defendants made public their decision to cease the manufacture and halt marketing of Defendants' Pelvic Mesh Products worldwide.

67.     Defendants insisted that they were merely no longer selling the Defendants' Pelvic Mesh Products.  Defendants vehemently denied that they were recalling the Defendants' Pelvic Mesh Products.

68.     Also in June 2012, Defendants asked the FDA to allow for Defendants' Pelvic Mesh Products to be sold in a limited fashion, accompanied by new and different instructions restricting the implantation procedure to insertion through the abdomen only, rather than through the vagina.  This change in instructions essentially was Defendants' admission that their prior prescription to doctors and surgeons that the Defendants' Pelvic Mesh Products be implanted through the vagina was never medically justified; worse, the prescribed procedure was not justifiable for any reason.

69.     Defendants gradually ceased the sale of Defendants' Pelvic Mesh Products entirely.

## AS AND FOR A FIRST COUNT
## AGAINST DEFENDANTS:

## DECEPTIVE TRADE PRACTICES,
## FALSE ADVERTISING,
## AND CONSUMER FRAUD

### VIOLATION OF GENERAL BUSINESS LAW §§ 349 and 350

70.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

71.     New York General Business Law § 349 prohibits as unfair and unlawful any deceptive business practice that is consumer oriented and has broad impact, is misleading or deceptive in any material respect, and results in actual harm.

72.     New York General Business Law § 350 prohibits any advertising that is misleading in any material respect, impacts consumers at large, and results in injury.

73.     Defendants knew that implantation with the subject Product was associated with the Defects described above.

74.     Defendants misled and deceived the consuming public and treating doctors by marketing the subject Product as a Section 510(k) medical device; failing to disclose the risks of implantation with the subject Product; continuing to promote the subject Product as a safe and effective product for treating pelvic organ prolapse and stress urinary incontinence; and continuing to fail to correct their prior disclosures as to the subject Product's nature, quality, and safety.

75.     Defendants used unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations and knowingly concealed, suppressed and omitted material facts with the intent that consumers, including Plaintiff herein and her physicians and medical providers, would rely upon Defendants' representations.

76.    Plaintiff and her prescribing physicians acted reasonably in light of the misrepresentations and deceptions.

77.    As a result of the Defendants' violations of General Business Law §§ 349 and 350, *et seq.*, Plaintiff suffered serious physical injury, including and not limited to exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, lost earnings, and was damaged in other ways, to be further shown by the evidence.

78.    As a result of Defendants' violations of General Business Law §§ 349 and 350, *et seq.*, Plaintiff was caused to incur expenses for her medical treatment and for non-medical care required as a result of her injury and hospitalization.

79.    Defendants' actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

80.    Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

81.    By reason of the foregoing, Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

82.    The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7).

83.    Pursuant to CPLR 1602(2)(iv), Defendants are liable for all of Plaintiff's damages, including but not limited to Plaintiff's non-economic loss, irrespective of the provisions of CPLR 1601, by reason of the fact that the Defendants owed the Plaintiff a non-delegable duty of care.

84.    Pursuant to CPLR 1602(7), Defendants are liable for all of Plaintiff's damages, including but not limited to Plaintiff's non-economic loss, irrespective of the provisions of CPLR 1601, by reason of the fact that the Defendants acted with reckless disregard of the safety of others.

### AS AND FOR A SECOND COUNT AGAINST DEFENDANTS:

### NEGLIGENCE

85.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

86.    Defendants had a duty to exercise the care of a medical device expert in the design, manufacture, testing, inspection, packaging, labeling, distribution, marketing, and sale of the subject Product.  Defendants had a duty to ensure that the subject Product was safe when prescribed and implanted as directed and to update the consuming public, including Plaintiff and Plaintiff's physicians and surgeons, on accurate information and instructions for the use of the subject Product.

87.    Defendants owed a duty to exercise reasonable care toward foreseeable users of the subject Product.  Defendants had a duty to adequately test the subject Product.  Defendants had a duty to inform consumers and their prescribing physicians and implanting surgeons of the dangers of implantation with the subject Product given the Defects.

88.    Defendants breached their duty to Plaintiff.  Defendants were negligent and reckless in the licensing, testing, designing, manufacturing, packaging, warning, labeling, advertising, promotion, marketing, distribution, and sale of the subject Product.

89.    The negligence of Defendants includes, but is not limited to negligence in the licensing, testing, designing, manufacturing, packaging, warning, labeling, advertising,

promotion, marketing, distribution, and sale of the subject Product, as well as in their failure to warn and adequately warn prescribing physicians, implanting surgeons, and the consuming public of the unreasonably dangerous effects and the relative severity, duration and permanency of the Defects and their consequences.

90.    Defendants failed to exercise reasonable care by not testing the subject Product and failing to disseminate to physicians and surgeons accurate and truthful information concerning the dangers and consequences of using the subject Product; thus, physicians, surgeons and patients were not able to make informed choices concerning the use of the subject Product.

91.    Defendants failed to exercise reasonable care in the manufacture, sale, testing, marketing, quality assurance, quality control and/or distribution of the subject Product into the stream of commerce, in that Defendants knew or should have known that the subject Product created a foreseeably high risk of Defects, dangerous consequences, and health hazards.

92.    The dangerous propensities of the subject Product as referenced above, were known or scientifically knowable, through appropriate research and testing, to the Defendants at the time they distributed, supplied, or sold the subject Product and not known to physicians and surgeons who would be expected to prescribe and implant the subject Product in the Plaintiff and other patients similarly situated.

93.    The information Defendants disseminated to physicians concerning the subject Product was, in fact, inaccurate, misleading, and otherwise inadequate, as described above.

94.    In connection with their design, development, manufacture, testing, inspection, packaging, labeling, distribution, marketing and sales of the subject Product, Defendants acted with reckless disregard for the safety of Plaintiff and others.

95.    As a direct and proximate result of Defendants' conduct, described herein, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe side effects, including exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and loss of earnings, and be damaged in other ways, to be further shown by the evidence.

96.    By reason of the foregoing, the defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR. The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7) among others, as alleged above.

## AS AND FOR A THIRD COUNT
## AGAINST DEFENDANTS:

### STRICT LIABILITY

97.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

98.    Defendants at all times relevant hereto were engaged in the design, marketing, promotion, manufacture, labeling, marketing, distribution and sale of the subject Product.

99.    Defendants manufactured and supplied the subject Product and placed it into the stream of commerce. At the time of distribution and thereafter, the subject Product was unsafe and unreasonably dangerous for its intended and foreseeable users.

100.    Defendants moreover sold the subject Product without proper, adequate, and timely warnings regarding the possible dangerous consequences associated with the Defects, nor the relative severity, duration and permanency of such consequences.

101.    Defendants affirmatively chose not to issue notices, warnings and instructions that would have accurately and completely conveyed the true risks and hazards posed by use of the subject Product.

102.    Defendants are strictly liable in tort to Plaintiff for injuries arising from the implantation with the subject Product.

103.    As a direct and proximate result of Defendants' conduct, described herein, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe consequences, including exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and lost earnings, and be damaged in other ways, to be further shown by the evidence.

104.    Defendants are jointly and severally liable.  The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7), as alleged above.

### AS AND FOR A FOURTH COUNT
### AGAINST DEFENDANTS:

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### AND FITNESS FOR INTENDED PURPOSE

105.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

20

106.   At all relevant times, Defendants manufactured, packaged, distributed, recommended, merchandised, advertised, promoted, supplied, marketed, and sold the subject Product, knowingly promoted the use for which the subject Product was prescribed by treating physicians and implanting surgeons and was being used by Plaintiff, and impliedly warranted that the subject Product was of merchantable quality and safe for these intended uses.

107.   Plaintiff and prescribing physicians reasonably relied upon the skill, expertise and judgment of Defendants and upon Defendants' representations that the subject Product was a Section 510(k) medical device and thus safe for its intended uses and was of merchantable quality.

108.   Defendants marketed the subject Product though they knew that the risks of dangerous consequences from the Defects were much greater than they had disclosed, and that physicians, surgeons and users such as Plaintiff would not be aware of these dangers.

109.   Defendants, by failing to give adequate warnings about these consequences from the Defects associated with use of the subject Product, had impliedly warranted that the subject Product was of merchantable quality and was fit for its ostensible ordinary purpose.  But the subject Product was not of merchantable quality nor fit for its ordinary purpose.  Thus, Defendants breached these implied warranties.

110.   As a direct and proximate result of Defendants' conduct, described herein, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe side effects, including exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for

additional surgery, and lost earnings, and be damaged in other ways, to be further shown by the evidence.

111.    By reason of the foregoing, Defendants are jointly and severally liable.    The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7), as alleged above.

## AS AND FOR A FIFTH COUNT
## AGAINST DEFENDANTS:

### BREACH OF EXPRESS WARRANTY

112.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

113.    Defendants expressly warranted in sales media, packaging, and marketing materials that the subject Product was safe and effective for its intended use: the treatment of pelvic organ prolapse and stress urinary incontinence and related female pelvic conditions.

114.    Plaintiff and Plaintiff's physicians relied on such express affirmations and warranties.    The express warranties were part of the basis for choosing, prescribing and implanting the subject Product.

115.    Defendants' express representations that the subject Product is a Section 510(k) medical device and long known to be safe and effective were belied by the existence of the Defects and the nature of and risks posed by the subject Product.    Though these Defects, risks and dangers were known to Defendants, they were hidden from medical providers and subject Product consumers, including the Plaintiff.

116.    Defendants breached these express warranties by promoting the false information, maintaining silence on and thereby concealing their knowledge of the falsity of the information.

117.    As a direct and proximate result of Defendants' conduct, described herein, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe injuries, exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and lost earnings, and be damaged in other ways, to be further shown by the evidence.

118.    By reason of the foregoing, the defendants are jointly and severally liable.  The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7).

## AS AND FOR A SIXTH COUNT
## AGAINST THE DEFENDANTS:

### NEGLIGENT MISREPRESENTATION

119.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

120.    In manufacturing, selling, promoting and distributing the subject Product, Defendants made statements that the subject Product is a Section 510(k) medical device that had been tested long ago and found to be a safe and effective form of treatment of pelvic organ prolapse and stress urinary incontinence, knowing that such statements are required by the FDA and the medical and health care community prior to and while the subject Product was made available to patients nationwide.

121.    Defendants knew Plaintiff and her physicians would rely and have relied on such statements and would be damaged if the statements were inaccurate.

122.    Defendants had a duty to subject Product users and prescribing physicians to take reasonable care to ensure that Defendants' statements regarding the safety and effectiveness of the subject Product are accurate.

123.    Defendants breached their duty to subject Product patients in that they did not exercise reasonable care in manufacturing, selling, testing, promoting and distributing the subject Product. Defendants acted unreasonably when they knew, were aware or should have known that the subject Product was not a true Section 510(k) medical device, was not adequately or at all tested, and lacked adequate and accurate warnings. Such Defects created a high risk of unreasonable dangers and serious injuries.

124.    Plaintiff and her physicians and surgeons did rely on Defendants' statements regarding the subject Product's safety.

125.    As a result of such reliance on the negligent misrepresentations of the Defendants, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe side effects, including exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and lost earnings, and be damaged in other ways, to be further shown by the evidence.

126.    By reason of the foregoing, Defendants are jointly and severally liable. The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7).

## AS AND FOR A SEVENTH COUNT
## AGAINST THE DEFENDANTS:

### FRAUD AND DECEIT

127.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth at length herein.

128.    Because Defendants did not conduct their own safety and efficacy research and testing in regards to the subject Product, Defendants had no knowledge that the subject Product was actually safe and effective for treatment of pelvic organ prolapse and stress urinary incontinence.

129.    Defendants knowingly made statements and distributed false information claiming that the subject Product was a Section 510(k) medical device and thus presumably was safe and effective for use.  Defendants made these false statements to Plaintiff, her treating physicians, the health care community, and to the FDA through reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media.

130.    Defendants also recklessly made statements and distributed false information claiming that the subject Product was safe and effective for use.  Defendants made these false statements to Plaintiff, her treating physicians, the health care community, and to the FDA.

131.    Defendants made these statements to induce Plaintiff, her treating physicians, and implanting surgeons to rely upon such statements and continue to prescribe and implant the subject Product in patients.

132.    Plaintiff, her treating physicians, and surgeons did justifiably rely upon Defendants' statements.  Neither Plaintiff nor treating physicians could have discovered the truth

about the subject Product's risks and dangers when the facts were in Defendants' exclusive possession.

133.    As a result of such reliance on Defendants' fraudulent and deceitful statements, Plaintiff was caused to suffer serious and permanent physical and emotional injuries and severe side effects, including exacerbated pelvic organ prolapse, exacerbated stress urinary incontinence, exacerbated cystolele, exacerbated uterine prolapse, difficulty urinating, infections of the reproductive and urinary systems, vaginitis, hematuria, and dyspareunia, the need for additional surgery, and lost earnings, and be damaged in other ways, to be further shown by the evidence.

134.    By reason of the foregoing, Defendants are jointly and severally liable.  The limitations on liability set forth in CPLR 1601 do not apply by reason of the exemptions set forth in CPLR 1602(2)(iv) and (7).

WHEREFORE, Plaintiff seeks judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorney fees, and all such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiff demands that all issues of fact in this case be tried to a properly empaneled jury.

Dated: New York, New York
       October 6, 2017

By:_____
              Katherine E. Mayo
       NYS 5231303
       NJ 096902013
       SULLIVAN PAPAIN BLOCK
       MCGRATH & CANNAVO P.C.

*Attorneys for Plaintiff*
120 Broadway, 18th Floor
New York, New York 10271
Telephone: (212) 732-9000
Facsimile: (212) 266-4182
kmayo@triallaw1.com